The next case for argument is 18-2091 ScentSational Technologies v. Pepsi Company. I think we're ready. Mr. Garner, please. Good morning. Good morning. Your Honor, if it pleases the court, I'm representing the appellant at ScentSational in this case. There are two major issues which are for the court's consideration. The first is whether or not the Forest District Court properly granted summary judgment. The second is whether the Forest District Court properly struck all three of ScentSational's expert witnesses. This case is a little unusual in that there were two summary judgment motions. The case was originally signed to Judge Karras. He held a summary judgment hearing, eliminated parts of the case, sent the rest. But that's past history. We have Judge Forrest's decision, right? Yes. But we believe that the court also should take into consideration the Karras decision because we have two district court judges looking at essentially the same facts. I agree the expert witnesses are different, but the facts of the case are the same. And they came to radically different decisions. Admission of expert testimony is very much a question of abuse of discretion. And she wrote pages and pages about why these witnesses weren't experts, for the most part, on what they were testifying to. And isn't that essentially beyond our review? Absolutely not. Abuse of discretion is where there is a clear error of fact and law. And in this case, the district court made a number of clear errors of fact and law. If we look at our expert, Dr. Sand, Dr. Sand's report and many of the writings about her in the decision were about her ability to opine on commercialization. And the district court said that she only worked on one failed project. That was the basis upon which the district court made the first determination. And that was clear error. Her own CV, as well as the other information, showed that she clearly worked on a number of projects that were commercialized. And so the court made an error right at the beginning that is manifest. Also, we asked for reconsideration with respect to the striking of Judge Sand. And along with that request for reconsideration, we included a declaration from her. That declaration shows that she has 25 years of experience working in the field. She worked for big companies like Gerber, Pillsbury, Kraft General Foods. She has actually seven different projects she commercialized, brought to commercial position. She also wrote a book called the Packaging Value Chain, which explains how you do commercialization. And when we presented all this information to Judge Forrest on our motion for reconsideration, we got back a one-page decision. And the judge did not address these qualifications at all. Simply didn't respond one way or another. What she did then was to move on to methodology, saying that Judge Sand had no methodology. Well, we believe that she did have a methodology. It's a methodology that's based on experience. She had this 25 years experience. She looked at the facts of the case. She compared them to her experience. And she then rendered a series of opinions throughout her report. And we believe that if you look to the advisory notes to Section 702, the advisory notes particularly say that where experience is the background, the quote, the method is the application of experience to the facts. That's precisely what Dr. Sands did. So she did have a methodology. The methodology is confirmed in the advisory opinion, I mean, the advisory rules. And is also confirmed in the Scott case. So here you have the court, again, making another error in terms of how to treat this case. I can mention that also in terms of methodology, that same experience methodology was used by Judge Kat, I'm sorry, by Dr. Katwalader. So she applied it both. She essentially created this kind of gauntlet for our expert witnesses. And she ran all of our witnesses through the gauntlet. And Pepsi's expert witnesses got a wave around the gauntlet. Because their expert, for example, Dr. Hotchkiss, he'd only spent two years in industry. And all the rest of his time was in commercial, it was in academia. Yet he was found to be qualified to talk about commercialization. Counsel, ultimately this case is about damages, right? And she found there was no way, there's a very small likelihood that this product would have been commercialized. And that's a major hurdle for you. We believe if she had considered the evidence, she would not have come to that conclusion. There was an important memo, the memo from September 12th. And it is in the, it's appendix 4108 to 10. And that memo says that we had moved from phase one and we're starting phase two. That all of the problems that we had had been solved. That this project in four months was to be prepped to launch. This was the understanding of both Coke and Pepsi. But she struck it as being hearsay on the basis that she thought it was created by a sensational employee, when it wasn't. In fact, we had pointed out to the court in a statement of fact 35, our answer to Pepsi's statement of fact 35, that it had been done by a Coke employee. We even cited to a document, appendix 4230, which is an email from a Coke employee distributing the memo to other people. And also repeating some of the same things that it's in the memo. That essentially it is, we're ready to go on to phase two, there are no problems. We're going to be ready to launch in January, just four months away. If they were so close and it was so promising, then why didn't they take a license under the Pepsi patent? And I noticed, if I read it correctly, Pepsi hasn't commercialized this product. That's true. They were accused of misappropriating the information, but they didn't commercialize it either. That's true. It's not actually part of this case, but it's not part of the appeal. But we believe they didn't commercialize it because they didn't know how. We had given them the information as trade secrets. They tried to do it on their own and they failed miserably trying to do it on their own. And that's why they didn't commercialize it. And what the harm here is that even though they didn't commercialize it, they put it in patent applications so that the information became published. And it was during that same week from September 12th through to September 20th, with all of this good information about both Coke and Sensational being ready to commercialize, suddenly came to an end when the Coke legal department found the Pepsi patent application. Now, I know the judge says, well, there's no way of showing whether or not that application caused it to be terminated, but that's simply not true. In that period from September 20th through to November 16th when it was finally terminated, there was a series of emails back and forth between the parties. And the only thing they are discussing is the Pepsi application. The fact that they asked for indemnification. What happens if Pepsi sues them? That's the only thing they were concerned. And ultimately, the termination of the project said that the risk was too high for Coke's internal problems. If you look to also the issue of damages, the district judge said that they were all speculative. But we believe that the district court in fact misunderstood the law. The law in the Second Circuit is that if the plaintiff demonstrates a genuine issue of fact as to the existence of actual damages, then summary judgment is inappropriate even if the precise amount or extent of damages is somewhat uncertain or speculative. And so we had a quantum of damages. Judge Farris had actually said those words. There's a quantum of damages that you've established. We also had the project, phase two of the project. What was the quantum that Judge Karras referred to? He did not specifically identify. He just looked at the overall evidence that we presented and said, you've established that you're entitled to a quantum of damages, not necessarily to the certain amount that your expert witnesses said. But I can give you some idea. Even after the case was put on legal hold, the Koch management asked us to continue into phase two even without an agreement. And our people did that. When the hold was finally turned into a termination in September, it ended. We actually got paid for that part of the work, but we didn't get paid for completing that phase two part of the project. It is clear beyond a reasonable doubt that but for this interference, we would have gotten the rest of the money for phase two, and that's well over $100,000. So that's a quantum of damage that gets us past summary judgment and gets us to the point where we can talk about trying to establish what our total damages are. But isn't there, I mean, you were asking for lost profits in the long run. I'm sorry? You were asking for lost profits in this case. Well, we were asking for what we lost as a result of the misappropriation. It includes the lost profit from the completing of phase two, as well as the lost profit from the commercialized product. And in terms of what we had to show for the commercialized product, on September 20th, Sensational internally calculated what kind of income they would get based on the information in the memo of September 12th. And they came to numbers that would support a figure of like $10 million per year eventually as a stream of income for them with this project. That's the kind of information where it's done internally as part of the business of the company that an expert can rely upon in order to determine the amount of money that they can recover. A brief comment on our damages expert. It was said that he had no methodology, but in his deposition he identified the methodology that they used. It was said that he relied only on Dr. Sands and the client. He actually took the client's information, including their tax records, and reviewed them completely before making his determination. The one issue may be the discounting. He said in his report, yes, the number that I give you needs to be discounted, but I can't tell how to discount it now. Relying on this court's decision in the energy capital case, it said that discounting is done as of the time of the judgment. At that time, there was no judgment, so he couldn't follow the rules that this court laid down. So we believe that failure to discount, if anything, is a minor issue. It's certainly not something that we should be losing summary judgment on the basis of that. Okay, why don't we... I'll just say the rest of our rebuttal. Thank you. May it please the court. To address Mr. Garner's points as best as I can in order that they're raised, first, with respect to the Daubert, Judge Lurie, I believe you're correct with respect to the discretionary abuse of discretion standard that takes place in a review of the decisions that are made. His response to that, partly, was that there were actual findings of fact that she made that he could pick out as being an error. Correct, Chief. To address the argument that he raises with respect to her background, however, again, you just need to look to her opinion at Appendix 36 through 37 where she talks specifically about Dr. Sands' past experience, her experience at Kraft, and how that did not constitute experience in all aspects of successful commercialization. She was digging into the CV. She was digging into the background of the expert to look at the qualifications. She also independently, in an independent step, looked at the methodology with respect to commercialization and found that that was unacceptable as well, that there was too much factual narrative, there was too much looking at things like the motives of the parties and the like, and made those determinations again by looking carefully at the facts and issuing, I believe, approximately 60 pages of opinions with respect to the Daubert issues. That's with respect to Sand. Counsel made a point with respect to Sand's methodology and talking about Sand in terms of basing her expertise on her experience. And I think he does look to the correct place, which is the advisory notes to Federal Rule of Evidence 702 that were adopted in 2000. But what Mr. Garner did not mention or talk about was how specifically there are three requirements talked about in those notes. It's been adopted by courts in the Second Circuit, such as Resolyn, talking about how that expert, if they're going to rely on experience, has to tie that experience to the conclusion that is reached, has to talk about why that experience is sufficient, and then has to explain how that experience reliably applied to the facts. That was not done here. Instead, the trial court, in great detail, by breaking it into seven categories of testimony that Dr. Sand had undertaken, went through each one to look at whether or not Dr. Sand had put forward the right type of analysis, thoroughness, and whether or not, if she was going to base it on experience, tie it out in the way that those requirements of Federal Rule of Evidence 702 are discussed in Resolyn and elsewhere. With respect to Hoberlein, the damages expert, which I think it was his final point, just a reminder to the court that what she did for that, what the trial court did, was found that his methodology was unacceptable because in two ways. What he did was he did not account for risk. He did not account for risk. He basically cherry-picked from two different methodologies that damages experts oftentimes use with lost profits. But he didn't use those portions that are the check, the check that looked to basically account for risk. But that doesn't have, of your friend's final point, was predicated on lost profits, including not just what happens once it's commercialized, but also its work at phase two and its compensation for phase two. And it seems like the basis for striking this damages expert didn't really cover that piece of it, right? I believe that the judge addressed the development fees issue in the summary judgment motion, but let me do it here and now. Where in the summary judgment did she address it if she did? Because I didn't, I may have missed it. Let me have my team check and answer that before I sit down. That's fine. With respect to the development fees point, just a couple of quick points. Two, one, they are characterizing those as lost profit damages. And if they're going to characterize it as lost profit damages, I have two issues or two problems with what they're doing. First is, they have put forward no evidence that it was agreed to in terms of a contract or the type of thing, setting out the obligations going forward. But more fundamentally than that, is if they're claiming it's lost profits, they put forward no evidence showing what the cost was with respect to this development fees or what the profit, lost profit, could have been. Lost profits usually involve a situation where you have sales. Correct, Your Honor. Here, there were never any sales. And so what ultimately gets down to whether there was a likelihood of commercialization. Correct, I agree with you. And this development fee notion is really on the side. Was it preserved? Was it raised? I believe it was mentioned in sensational summary judgment brief, Your Honor. But in doing so, this court has the opportunity on a de novo review. Was it raised in the context of being a portion of lost profits? Sensational maintains that they are seeking, I believe exclusively, lost profits in this case. They do not characterize the development fees as actual damages, Your Honor. It's in the portion of their brief that's talking about lost profits. Compared to the $73 million being sought of lost profits, generally we're talking about something that while they've marked it as confidential, I'd refer you to the briefing and that it is in the low hundreds of thousands of dollars with respect to this development fee point. But nonetheless, if they have raised it and if, as you suggested earlier, the judge addressed it and presumably rejected that as a basis for recovery, then it puts the case in a different light from what it might be if all we were talking about is the lost profits in the conventional sense of that term. They have rather different, it seems to me, arguments with respect to Phase 2 payment versus whatever would have happened after commercialization if commercialization ever occurred. Fair enough in terms of the distinction, but if they're going to create a distinction on the development fees for Phase 2 and they're going to characterize it as lost profits in order to create a material issue effect on that issue, they need to put forward evidence of what the profit was. A material issue effect that there was some profit gained or some evidence with respect to what their cost was going forward. They put forward an unsigned agreement that basically lists out that they drafted that there is no evidence in the record was agreed to definitively by Coca-Cola for going forward. And they're going to use that as a lost profit claim. The nomenclature that was used seems to me not nearly as important as the substance of what was going on. Now, if the substance of what was going on is there was not a signed agreement with respect to Phase 2, but there was an understanding between the parties that Phase 2 would continue and Phase 2 apparently did continue and they continued to be paid for Phase 2 until the termination in September 22nd or whatever it was, then they have an argument that in all likelihood they would have at least been able to complete Phase 2 and been paid for it. I think the difficulty again is there's two or three difficulties. One is with respect to the documents that they based it on and whether it provides a proper basis for creating a material issue effect on that. The second is as to whether or not again they've characterized it as lost profits and how they're going to create a material issue effect on it and whether they've properly raised that issue. They have not raised that issue as an actual damages issue in their briefing and talked about it and they didn't below either. And so in terms of trying to make an argument and a response to it, that's why I have to... You said they didn't raise it in their briefing. As an actual damages argument. They're raising it as seeking partially what they claim to be lost profits. I believe Mr. Garner did that today. I don't know that it's terribly helpful to be saying that they called it the wrong thing. If they made perfectly clear what they were asking for, then that seems to me that ought to be what we're attending to. Not if they gave it the wrong name. Let's go with all the assumptions that they got it right or that they're getting to the right place. They still have to put forward a material issue effect with respect to the creation of the agreement, the performance that would take place and what their profits would be. They've agreed. With respect to creating a material issue effect on summary judgment. And they haven't done that here. They make reference to the agreement. They don't make any claim in terms of what those damages are. They claim that they should be entitled to the full amount of the development fees that they were going to go forward to get, but that never took place. And they claim all of it and not the profit that would result from it. That sounds like a breach of contract claim. It does. And it sounds like a breach of contract claim really for actual damages. And again, this is what we were dealing with with respect to their arguments below were trade secret claims and in the alternative breach of contract claims that rose and fell together by all courts that we're looking at whether you're talking about Judge Karras in his first opinion or Judge Bors in her second opinion. In terms of the causation point before turning to damages on summary judgment causation, there were some characterizations of the record by Mr. Garner. And I'd just like to remind the court of the analysis that the trial court did and some of the citations that she made to the record that included, again, the really uncontroverted testimony from the Coca-Cola witnesses who were subpoenaed and deposed by counsel for sensational who had testified that at the time of termination the likelihood of commercialization was, quote, very low. Talked about how even in that later stage where they were talking about things such as prep to launch that it was still very far out that that would just be the beginning stages. That's found in the red brief at page 12, Joint Appendix 3106. Above and beyond that, another co-witness, Mr. Aranda, who testified that the technology never worked so I cannot assume that it was going to work. And that can be found at the Joint Appendix 3026 and at the red brief at pages 10 and 22. Finally,  regarding business commitment and that no business unit was committed to the project. That's a quote that is found at the Joint Appendix at 3029 and at the red brief at page 43. So again, there is a clear set of evidence with respect to the company that was responsible for and going to be seeing this through to commercialization which was Coca-Cola that in their opinion there were significant issues remaining that made commercialization unlikely. That's why the Sand opinion was so important in terms of the Dauber. That what Sand had done was taken the 35% likely testimony from the Coke witness the very unlikely testimony and transformed that into high likelihood of commercialization. That's what Judge Forrest was looking at on the Dauber in terms of whether or not to allow her testimony on commercialization to go forward. She acted within her discretion to exclude that for lacking any kind of rigor or methodology. And that's what left this case on summary judgment in terms of creating a material issue effect. My understanding is that Judge Forrest did not act on the motion your motion for summary judgment with respect to the existence of and breach of the misappropriation of trade secrets. That was left standing by the side of the road essentially when she entered the summary judgment that she did. Why isn't that if there is a submissible case on the question of whether there were trade secrets and whether they were misappropriated why wouldn't the plaintiffs at least in theory be entitled to nominal damages even if their theory for the recovery of lost profits or the phase 2 damages were to fail? I'll get to it I think I've got your question which is so we've got our arguments with respect that we were successful on summary judgment with respect to causation and then independently with respect to damages. We had additional arguments at the trial court level with respect to the existence of the trade secret and the misappropriation. They haven't been addressed yet weren't addressed by the district court and your question is if all four elements are found to exist in terms of creating a material issue of fact to go to a jury would they be entitled to nominal damages? Well if the elements of the       issue of fact to go to a jury would they be entitled to nominal damages award? I wouldn't think so. The causation I take it is the causation of loss of all these profits from the downstream consequences of misappropriation. I think I agree with you in the sense that there is still the fundamental causation problem that they are seeking recovery for an injury that they claim as a result of the misappropriation of the existence of the trade secret and they have to make that link. The point that we were making below and that we believe should be affirmed here today is that they have failed to create a material issue of fact with respect to that causal form of damages even against nominees. Is damages an element of the cause of action for trade secret? I didn't think that was so in New York law. I have seen it listed in elements by some New York courts and not listed in other elements by other New York courts. I have seen analysis and discussion of it as being necessary for recovery of damages whether or not those courts are making. If in fact it's true that the showing of actual damages is not an element of the cause of action for misappropriation of trade secrets, then would they not be entitled at least to have that question resolved by the court and potentially get nominal damages? Again, I don't think if they have  to show causation. I think there would still have to be some  of link between their existence and misappropriation assertion and the injury they claimed to suffer. Did the court find that there was no trade secret proved? No, Your Honor. The court simply didn't address the issue. Your Honor is correct that the court did not address arguments raised by PepsiCo that there was no trade secret in existence and that there was no misappropriation of that trade secret. Instead the trial court issued its summary judgment on two independent grounds causation and damages. Thank you Your Honor. I would like to address some of the issues raised by my worthy colleague. The testimony about Mr. Aranda. Mr. Aranda did not actually work on the project. He was not at the meeting that was held on September 12th. He talked about issues with the project not working which occurred before September 12th. The very critical nature of the September 12th memo is that it points out the fact that the issues that had been raised before as to whether or not this was a viable project had been overcome and that we were moving on to commercialization. Also, it should be pointed out that Mr. Gibbs did say he believed that at the time of termination the likelihood of the Pepsi patent application they discussed it. Sensational tried to convince Coke to go ahead despite it saying the patent will never issue and it was a back and forth. At that point it was 35%. Before the Pepsi application introduction it was more likely than not this was going to be commercialized. Further, there was an email which was exchanged between Coke and Pepsi on September 14th and 16th. The guy in the Coke side was not  with the email. The email was 41-12. The sensational part is at the bottom and Coke is at the top. The court picked one sentence and the court said it simply cannot support an inference of commercial commitment. Of course it doesn't. But if you read the rest of the email you see both parties agreed that they would make the project a great success. In the case of   said they would make the project in January in prep to launch phase. There was also an email on September 20th saying that he was urging the court  look at the other issues. The district court improperly struck the testimony of our damages expert. Yes, he looked at the proper information, he used a well understood methodology and arrived at reasonable figures. He's entitled to rely on an expert report of Dr. Sands even if it's contested. He's allowed to rely on the client's information provided as long as he analyzes it. In terms of the advisory notes, we think that in reviewing the Sands as well as the Cadwalader opinions, you will see that they did precisely what the advisory notes asked for. They set forth their criteria, they looked at the factors in the record to show what was important in their review,       record  what was important in their  And they looked at the factors in the record to show what was important in their review. And they looked at  So they said that there was an understanding. They just asked to do it. They're a big client. We did it. And that we sent them a bill at the end of the project and they paid it. It's reflected in our income tax statement which is here. So and the question is okay, what's the cost differential? You have two guys doing whatever they can to get this project done. Was there some cost? I imagine there was. But it's trivial compared to well over $100,000. So we can at least assume that the cost is   $100,000. So we can assume that the cost is less than $100,000. So we can  assume  the cost is less